```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION
```

Nancy S. Woodard,                   :

    Plaintiff,                   :

  v.                                :       Case No. 2:11-cv-1055

                                              :       JUDGE GREGORY L. FROST
Commissioner of Social Security,            Magistrate Judge Kemp

    Defendant.                   :

## REPORT AND RECOMMENDATION

### I. Introduction

Plaintiff, Nancy S. Woodard, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income. Those applications were filed on June 16, 2003, and alleged that plaintiff became disabled on January 3, 2003.

After initial administrative denials of her applications, plaintiff was given a hearing before an Administrative Law Judge on July 10, 2006. In a decision dated June 18, 2007, the ALJ denied benefits. Subsequently, the Appeals Council remanded the case for further evaluation of the medical evidence. A second administrative hearing was held on July 31, 2010, which also resulted in a decision denying benefits. That decision became the final decision of the Commissioner when the Appeals Council denied review on September 22, 2011.

After plaintiff filed this case, the Commissioner filed the administrative record on March 27, 2012. Plaintiff filed her statement of specific errors on April 13, 2012. The Commissioner filed a response on July 16, 2012. No reply brief has been filed, and the case is now ready to decide.

II.  <u>Plaintiff's Testimony at the Administrative Hearing</u>

Plaintiff, who was 45 years old at the time of the administrative hearing and who has a high school education, testified as follows.  Her testimony appears at pages 996-1024 of the administrative record.

Plaintiff last worked on January 3, 2003.  At that time, she was working as an assistant manager at a McDonald's restaurant.  She began having pain in her right knee and took a two-month leave of absence to see if it would improve, but it did not.  She had the knee replaced, but still suffers from pain and inflamation.  In addition, she developed problems with her left knee.  Both knees have been treated with cortisone shots.  She rides a scooter, prescribed by her doctor, because walking is difficult, and walks with a cane.

Plaintiff also testified to back problems.  She has degenerative disease in her lower back.  At the time of the hearing, she was not getting any treatment for her back due to lack of funds.  She also described nerve damage in her left wrist and said she wore a wrist brace all the time, even while sleeping.  She suffers from diabetes as well, but at the time of the hearing it was fairly well controlled with insulin and other medications.  Also, she has shoulder problems which prevent her from working overhead with her left arm.  Her high blood pressure was under control.  She was attempting to lose 200 pounds.  She did not testify to any psychological problems.

For knee pain, plaintiff took pain medications. Percocet, in particular, caused drowsiness, but she took it on average about twice a week.  Her most comfortable position was sitting with her feet up.  Plaintiff testified that her back was getting worse, as was her left knee.  She was able to walk half a block, using a cane, and could stand for five to ten minutes.  Back pain was the most significant limiting factor for these activities.

She could sit for half an hour at a time and could resume sitting if she got up and moved around for a few minutes. She could lift up to five pounds and could climb only a few steps.

Plaintiff did not believe she could do any of her past work due to her inability to bend, lift and stand as required. If she had a sedentary job, her ankles would swell. She does not do household chores but does shop for groceries and occasionally visits friends or goes to movies. She had been participating in pool therapy for about five months. She needed assistance tying shoes or showering. In a normal day she would lie down for an hour or more. She could attend some school activities for her children, and during the day she read, listened to music, and used a computer. Several days a week, her pain level would make it impossible for her to go to work.

### III.   The Medical Records

The medical records in this case are found beginning on page 144 of the administrative record. The pertinent records can be summarized as follows. This summary will focus on the treatment records from Dr. Franklin and nurse practitioner Ms. Rutan, as well as consultative examiner Dr. Smith, because that evidence is also the key to evaluating plaintiff's first statement of error.

Dr. Franklin began treating plaintiff as early as 2000, when he saw her for de Quervain's stenosing tensynovitis of the extensor tendons of the right wrist and possible carpal tunnel syndrome of the left wrist. The former condition was treated surgically and plaintiff continued to work for several years afterward.

Next, in 2002, Dr. Franklin started treating plaintiff for her right knee problems. She had arthroscopic surgery in July of that year and, again, went back to work afterwards. Another such procedure was performed early in 2003 after plaintiff continued to report pain and instability in the knee. She never returned

to work after that surgery.  The records show that during the next several months, she continued to seek treatment from either the emergency room or from Dr. Franklin for continued problems with her knee, and that she also had surgery on her left wrist. X-rays taken toward the end of the year showed arthritis in the knee, and she had begun wearing a knee brace.

Dr. Franklin wrote a lengthy report on September 14, 2004, detailing the history of his treatment of plaintiff's various conditions.  First, he noted that her left wrist problems prevented her from using her left hand for repetitive motions. He had not been treating her back problem but thought it would affect her sitting and standing.  He said her right knee was the most incapacitating factor, and since he viewed her as too young for total knee replacement, he thought those problems would disable her from working competitively in a fast-paced environment.  (Tr. 491-94).  He also completed a form indicating that she could sit for six hours in a work day and stand for one hour, but needed to get up and move around every thirty minutes. At about the same time, Ms. Rutan completed a questionnaire about plaintiff's diabetes in which she stated that plaintiff could only sit or stand for one hour each during a work day.  (Tr. 512-16).  Two years later, Dr. Franklin wrote another letter confirming his conclusions, indicating that plaintiff had gotten somewhat worse, and that with her knee problems, she would either not be able to work 40 hours per week or "perform[] any of the work duties she was capable of doing prior to initiation of her disability."  (Tr. 623-24).  Ms. Rutan also supplemented her report in 2006, stating that her practice group saw plaintiff four to five times per year and that plaintiff was disabled due to limitations from her diabetes and joint problems.  (Tr. 687).

Dr. Smith performed a consultative physical examination on April 21, 2006.  At that time, plaintiff's chief complaint was

-4-

pain in her right knee, left wrist, and low back.  She was using crutches and taking Vicodin and Percocet to control the pain.  She could climb stairs but with difficulty and said she could not kneel, squat, stoop or crawl.  She weighed 295 pounds.  Her left hand pinch and grasp were abnormal as was the range of motion of her right knee.  Dr. Smith diagnosed osteoarthritis of the right knee as well as other conditions and noted that she was dependent on a brace for the right knee and the left wrist.  He thought she was impaired with respect to walking, lifting, bending, kneeling, carrying, and handling objects in her left hand, but her ability to sit was not impaired.  (Tr. 595-97).  He also completed a form on which he indicated she could walk for four hours in a day, but not more than 30 minutes at a time.  (Tr. 602).  Dr. Smith did a follow-up evaluation on November 2, 2009.  At that time, plaintiff had real difficulties with her left wrist and hand including continuous pain and intermittent swelling.  She was not using a cane at that time but would use a scooter when she was out for longer periods.  She did dusting and cooking at home but would sit while cooking.  Her right knee pain was better since she had her knee replaced.  She walked with a slight limp.  He completed a form indicating she could sit, stand and walk for a total of seven hours in a work day and could lift up to ten pounds,  (Tr. 934-47).

On December 4, 2007, plaintiff was evaluated by Dr. Lombardi, who recommended total right knee replacement.  At that time, her level of activity was described as "semi-sedentary."  (Tr. 784).  Knee replacement surgery was performed by Dr. Franklin on December 20, 2007.  Within a month, plaintiff had made good gains in strength and functional ability.  She made slow but steady progress over the course of the next number of months, with some setbacks.  Her primary complaints over that time frame related to her hands and wrists more than the knee.

-5-

Treatment notes throughout 2009 are similar, and by 2010 Dr. Franklin stated that plaintiff's primary problems were her left knee and left wrist, although he also said that "her function remains significantly impaired as previously documented."  (Tr. 953).

### IV.   The Vocational Testimony

A vocational expert, Ms. Ewers, also testified at the administrative hearing.  Her testimony begins at page 1024 of the record.  She characterized plaintiff's past work as a fast food manager as light and semiskilled, and as a fast food cook as medium and semiskilled.

Ms. Ewers was asked questions about a hypothetical individual of plaintiff's age who had plaintiff's education level and work history, and who could do light work with no climbing of ropes, ladders or scaffolds and occasional climbing of stairs, balancing, stooping, kneeling and crawling, with no work on uneven surfaces and no exposure to hazards or extremes of temperature.  She testified that a person with those restrictions could do various light jobs such as copy machine operator, electronics worker, rental clerk, and mail clerk.  Additional jobs would exist at the sedentary level.  The number of these jobs would be slightly reduced if the person could stand or walk for only four hours in the work day, and 15,000 light jobs and 4,000 sedentary jobs would still remain if the person also could not do more than occasional fine manipulation with the non-dominant hand.  A ten-pound lifting restriction would further reduce the number of light jobs, but not the sedentary ones.  Someone with a cane could perform those remaining jobs.  Plaintiff's job skills would transfer to a number of light and sedentary positions.

In response to questions from plaintiff's counsel, Ms. Ewers testified that a person who kept their feet elevated for five

hours a day could not work.  The same would be true for someone off task for up to 25% of the day due to pain or side effects of medication.  Also, someone who needed to lie down for two hours during the work day or who would miss three or four days per month for medical reasons would not be employable.

        V.   <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 23 through 36 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff met the insured requirements for disability benefits through March 31, 2008.  Next, plaintiff had not engaged in substantial gainful activity from her alleged onset date of January 3, 2003, through the date of the decision.  As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including bilateral de Quervain's tenosynovitis with residuals of surgery and chronic condition in the left, non-dominant hand; internal derangement in the right knee with mild arthritis initially progressing to severe in the later record and total knee replacement; moderate arthritis in the left knee per MRI in December 2007; vertebrogenic disorder of the lumbar spine; and obesity.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to lift up to ten pounds, to stand or walk up to four hours in an eight-hour work day, that she could not climb ropes, ladders or scaffolds, that she could not push or pull more than ten pounds on the left, that she could only occasionally climb stairs, balance, stoop, kneel, crouch, or crawl, that she could

only occasionally handle or finger on the left, that she could not work on uneven surfaces, that she could not be exposed to hazards or cold extremes, that she could not be more than occasionally exposed to heat extremes, humidity, wetness, irritants, or vibrations, and that she could not perform jobs that did not permit the use of a cane or motorized scooter to ambulate.  The ALJ described this capacity as a "reduced range of sedentary work."  (Tr. 30).  Adopting the vocational expert's testimony, the ALJ found that plaintiff could not do any of her past work but could perform unskilled sedentary jobs such as assembly patcher, weight tester, surveillance system monitor, and charge account clerk.  Because the testimony showed that those jobs exist in significant numbers in the regional and national economies, the ALJ concluded that plaintiff was not entitled to benefits.

VI.  Plaintiff's Statement of Specific Errors

In her statement of specific errors, plaintiff raises two issues.  She argues (1) that the ALJ did not properly weigh the medical evidence, and particularly the opinions expressed by Dr. Franklin and nurse practitioner Ms. Rutan; and (2) that the ALJ not properly assess her credibility.  The Court generally reviews the administrative decision of a Social Security ALJ under this legal standard:

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th

-8-

Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

As to plaintiff's first statement of error, it has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. §404.1527(d); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994). No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to

provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision.  Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

Here, the ALJ first discussed the various reports of disability authored by Ms. Rutan.  He gave them no weight, noting that plaintiff was seen by Ms. Rutan primarily in connection with her diabetes and not for orthopedic issues, and that there was no evidence that diabetes was even a severe impairment.  Further, the ALJ concluded that nothing in the treatment records from the practice group which Ms. Rutan worked for showed any objective basis for the conclusion that plaintiff could not perform even sedentary work.

Next, the ALJ reviewed Dr. Franklin's reports.  The starting point of that analysis was an incorporation of the rationale of the prior administrative decision which gave less than controlling weight to Dr. Franklin's opinion.  That decision, found in the record at Tr. 716-31, found that Dr. Franklin's various opinions were "neither well-supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record." It also found that at least part of his opinion was based on vocational factors.  The decision identified the reports of the state agency reviewers and the testimony of a medical expert, Dr. Hutson, at the first administrative hearing as the specific evidence in the record which contradicted Dr. Franklin's opinions.  (Tr. 727-28).

Lastly, the ALJ commented on the restriction of seven hours of sitting, standing and walking during a work day, noting that such a restriction seemed "a bit arbitrary" and no reason was given why plaintiff could do those activities for seven hours, but not eight.  He also noted that plaintiff's right knee had

improved following surgery and that she was always able to walk, and that even with a restriction based on use of a cane she could still do a number of sedentary jobs.  The ALJ also rejected Dr. Smith's seven-hour restriction, noting that it did not comport with the record as a whole and was not supported by his own report.  Finally, he noted the seeming inconsistency between plaintiff's ability to do a variety of daily activities and the restrictions placed on her by Dr. Franklin.

Plaintiff, in her statement of errors, describes the ALJ's decision-making process as "fatally flawed."  With respect to Dr. Franklin's opinions, she contends that the ALJ did not take into account her entire testimony about daily activities, which included not only the things the ALJ found she could do - attending pool therapy, grocery shopping, visiting, reading, infrequently going on vacation, assisting her children with homework, attending their school activities, and doing some minor household chores - but also things she could not do, such as most of the housework or cooking, being unable to shop without using a scooter, or needing help with showering and tying her shoes.  She analogizes this case to Rogers v. Comm'r of Social Security, 486 F.3d 234 (6th Cir. 2007), a case in which the Court of Appeals criticized the ALJ's decision because the ALJ had improperly compared "somewhat minimal daily functions" to "typical work activities."  Id. at 248.  Finally, she argues that the ALJ failed to consider the other factors set forth in 20 C.F.R. §404.1527 when evaluating Dr. Franklin's opinions.

Plaintiff does not argue directly that the ALJ failed to articulate his reasons for discounting Dr. Franklin's opinions to some extent, and the Court finds that the ALJ gave an explanation which is sufficiently detailed to satisfy the "articulation" requirement set forth in §404.1527(d) and to be reviewable.  Thus, the question becomes whether a reasonable person could have found, based on this record, that Dr. Franklin's opinions were

not entirely supported by objective testing, were not consistent with other portions of the record, and were contradicted to some extent by plaintiff's own testimony about her activities of daily living.

The record does not appear to contain the transcript of the first administrative hearing, so the Court cannot review the testimony of Dr. Hutson for consistency with Dr. Franklin's views.  It is true that Dr. Smith's first report indicates fewer restrictions that Dr. Franklin would have imposed, although his second report reflects the inability to perform work-type activities (i.e. sitting, standing and walking) for more than seven hours in a work day.  Nevertheless, it is a fair reading of Dr. Franklin's reports that he was taking plaintiff's fast-food manager's job into account when stating that she could no longer engage in competitive work; much of the language in his reports deals with the inability to do the demands of that type of work or to engage in strenuous labor.  Those reports, other than in conclusory fashion, do not directly address the question of whether plaintiff could do a limited range of sedentary work where she could use a cane, did not have to do any significant lifting, use her left hand more than occasionally, and could get up and move around periodically.  It is also true that the objective evidence is hard to reconcile with Dr. Franklin's view that plaintiff's condition, and inability to work, was much the same before and after her knee replacement; even his own records and reports show that her right knee pain and mobility had improved and that her more recent issues were with her left wrist and left knee.  Thus, the ALJ was justified in refusing to give controlling weight to Dr. Franklin's opinions for these reasons.

Additionally, the Court agrees with the Commissioner that this case is not on all fours with <u>Rogers</u>.  The Court of Appeals noted, in that case, that the claimant could not even do the daily activities she described in the way that most people would

be able to, and that the ALJ had mischaracterized her testimony. Here, by contrast, the ALJ appears to have understood and described plaintiff's testimony accurately, and she did perform a number of activities, such as cooking (even while seated), grocery shopping (again, while seated on a motorized scooter), going to school functions, and engaging in pool therapy, which showed the ability to do tasks similar to those needed to perform a limited range of sedentary work.  The fact that there were some things, such as showering or tying her shoes, which she needed help with is not necessarily inconsistent with the ALJ's residual functional capacity finding, especially given the fact that the ALJ did not credit her testimony fully.  Again, there is support in the record for the ALJ's use of the activities plaintiff could perform as some evidence – even if not conclusive evidence – that she could also do a limited range of sedentary work with various restrictions.  This is consistent with the controlling law.  See, e.g., Blacha v. Sec'y of HHS, 927 F.2d 228, 231 (6th Cir. 1990) ("as a matter of law, an ALJ may consider household and social activities in evaluating complaints of disabling pain").

    Finally, it is clear that the ALJ considered the other regulatory factors.  The ALJ understood the length of the treating relationship and the fact that Dr. Franklin was an orthopedic specialist, and took into account the nature of the tests performed and the treatment provided.  On balance, the Court concludes that the ALJ acted within his discretion in deciding to discount Dr. Franklin's opinion to a certain extent, and finding that plaintiff was slightly more able to do work-related activities than Dr. Franklin believed.

    As far as Ms. Rutan, the nurse-practitioner, is concerned, plaintiff argues that although a nurse-practitioner is not considered an "acceptable medical source," the opinions of such a health care professional must still be considered.  She asserts that the ALJ did not give these views adequate consideration,

rejecting them instead simply because Ms. Rutan did not treat plaintiff for her orthopedic issues.

The Commissioner responds, and the Court agrees, that the ALJ followed the applicable Social Security Ruling, SSR 06-3p, in evaluating these opinions.  That ruling does direct an ALJ generally to the considerations set out in §404.1527, but it also states that the regulations do not directly apply to sources such as nurse practitioners, and that opinions from such sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  It then says that the §404.1527 factors "can" be part of the evaluation process, and recommends that the ALJ give a statement of reasons for accepting or rejecting opinions from such sources.

Here, the ALJ correctly noted that Dr. Franklin, not Ms. Rutan or the doctors she worked for, treated the most potentially disabling conditions from which plaintiff suffered - specifically her wrist and knee problems.  Further, the ALJ found that plaintiff's diabetes, which is what she usually saw Ms. Rutan for, was under control, posed no serious restrictions to her functioning, and was not a severe impairment.  Plaintiff does not challenge this finding.  It is true that in many of her treatment notes, Ms. Rutan describes, to some extent, orthopedic issues, but that was not the focus of her treatment, and it is certainly permissible for an ALJ to discount an opinion of any source, acceptable or not, to the extent that it is based on conditions for which that source has not provided treatment.  It is also true that Ms. Rutan's notes do not describe the results of any objective testing supporting whatever conclusions she drew about plaintiff's ability to work.  The Court concludes that the ALJ adequately considered Ms. Rutan's opinions and explained his reasons for discounting them, as SSR 06-3p requires, and that he did not commit any reversible error on this issue.

The final issue about medical source opinions relates to Dr. Smith.  The ALJ appears to have accepted Dr. Smith's 2006 opinion more or less in its entirety, and almost all of his 2009 opinion, with the exception of its limiting plaintiff to only seven hours of combined sitting, standing and walking.  As noted above, the ALJ explained why he rejected that small portion of the report. Plaintiff claims, however, that the reasons given by the ALJ for doing so were impermissibly vague and, in addition, that there is no direct support in the record for the ultimate finding as to plaintiff's residual functional capacity.

The Court does not find the ALJ's explanation impermissibly vague; the ALJ clearly stated that Dr. Smith's own report did not provide any support for his conclusion that plaintiff was either not capable of sitting for an extra hour during a work day or standing or walking for the same amount of time.  Further, in his earlier report, which reflected his views before plaintiff had her knee replacement surgery, he thought she could stand and walk for four hours, and the record reflected improvement in her right knee after that date.  Finally, the Court finds that the RFC which the ALJ arrived at, while not corresponding directly to any specific medical report, draws elements from the various reports and also credits some of plaintiff's testimony, such as her need to use a cane, which was not directly supported by some of the medical evidence.  It was within the ALJ's "zone of decision" to determine this particular residual functional capacity, and each part of it has some support in the record.  That is enough to insulate it from reversal.  See, e.g., Poe v. Comm'r of Social Security, 342 Fed. Appx. 149, *7 (6th Cir. August 18, 2009)("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician. See 20 C.F.R. §§ 404.1546(c), 416.946(c).  Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual

functional capacity finding").

The second major issue raised by plaintiff's statement of errors deals with the way in which the ALJ judged her credibility. She argues, first, that the ALJ used an incorrect legal standard, evaluating her credibility against the ALJ's residual functional capacity finding rather than against the entirety of the record. In support of this argument, she cites to the decision in Bjornson v. Astrue, 671 F.3d 640 (7th Cir. 2012), a decision which is critical of the template used by ALJs because it implies that the ALJ has made a finding as to residual functional capacity prior to determining if the claimant's testimony is credible rather than in the opposite sequence. Plaintiff also contends that the ALJ's reliance on testimony given at the first administrative hearing was error because, as noted above, the transcript of that hearing is not a part of the record before the Court. Finally, she asserts that her testimony at the second hearing was consistent with the medical evidence and establishes disability.

In response, the Commissioner argues that the ALJ reasonably determined that plaintiff's testimony, to the extent that it supported a finding of total disability, did not have to be accepted at face value. The Commissioner asserts that the ALJ's discussion of plaintiff's credibility is a "textbook discussion of Social Security Ruling 96-7p." Commissioner's memorandum, Doc. 18, at 13. The ALJ, says the Commissioner, took the correct factors into account, including the plaintiff's testimony, the medical records, plaintiff's activities of daily living, her symptoms, and her medication and treatment, and then cited to reasons for discounting her testimony which are supported by the record. Those reasons included the fact that the medical records indicated, contrary to plaintiff's testimony, that the condition of her right knee improved following surgery, and the fact that the prior ALJ made a credibility finding which was based in part

-16-

(and, according to the Commissioner, properly) on that ALJ's observation of plaintiff at the first hearing.

This Court has, in <u>Jones v. Comm'r of Social Security</u>, 2012 WL 5378850 (S.D. Ohio Oct. 30, 2012), and <u>Williams v. Astrue</u>, 2012 WL 4364147 (S.D. Ohio Sept. 24, 2012), acknowledged the <u>Bjornson</u> decision, but has held that when an ALJ, despite using the standard template, engages in a complete discussion of the credibility issue, the Court will simply review that determination to insure that it is supported by substantial evidence. Consequently, the Court will review the ALJ's credibility discussion in light of SSR 96-7p and the entirely of the record.

The ALJ noted, first, that plaintiff was not using any kind of ambulatory aid at the time of the prior hearing, and engaged in a wide range of daily activities. By the time of the second hearing, notwithstanding her knee replacement, she said that her activities were more limited and that she was using ambulatory aids. Although the testimony from the first hearing is not in the record, the first administrative decision is, and the second ALJ did not determine that plaintiff was not truthful at the first hearing, but rather took that testimony at face value. The Court does not view this as erroneous.

Second, the ALJ found that plaintiff's testimony at the second hearing concerning her various activities was "not inconsistent with a sedentary range of work." (Tr. 34). That finding is an interpretation of the testimony which a reasonable person could have adopted. Although the Court does not necessarily agree that the ALJ's discussion is "textbook," and the ALJ did not engage in a lengthy discussion of the apparent discrepancies between the medical evidence and plaintiff's testimony, the Court concludes that the discussion is thorough enough to demonstrate that the ALJ used an appropriate legal standard, took into account matters which do have a relationship

to credibility, and relied on facts which were adequately supported by the record.  The ALJ reasonably concluded that, to the extent that plaintiff testified to symptoms which would have prevented her from doing even a reduced ranged of sedentary work, that testimony was not credible.  That is enough to prevent the Court from overturning the ALJ's credibility finding. See generally Foreman v. Commissioner of Social Sec., 2012 WL 1106257 (S.D. Ohio March 31, 2012) (Watson, J.), citing Walters v. Comm'r of Social Security, 127 F.3d 525, 531 (6th Cir. 1997); Felisky v. Bowen, 35 F.3d 1027, 1036 (6th Cir. 1994).

## VII. Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social Security.

## VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the

Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).


/s/ Terence P. Kemp
United States Magistrate Judge